UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY KRUGER,

        Plaintiff,                                  Hon. Wendell A. Miles

v.                                                   Case No. 1:07-CV-415

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 24 years of age at the time of the ALJ's decision. (Tr. 19, 46). She successfully completed high school and worked previously as a caregiver, behavior aide, sales clerk, and general office clerk. (Tr. 17, 67, 72, 87-92).

Plaintiff applied for benefits on December 5, 2002, alleging that she had been disabled since September 15, 2001, due to ADD, bipolar disorder, and obsessive-compulsive disorder. (Tr. 46-48, 66). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 20-45). On February 26, 2006, Plaintiff appeared before ALJ Lawrence Blatnik, with testimony being offered by Plaintiff and vocational expert, Melody Henry. (Tr. 430-71). In a written decision dated September 14, 2006, the ALJ determined that Plaintiff was not disabled. (Tr. 12-19). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 5-8). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on June 30, 2003. (Tr. 12); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

      A.      Physical Impairments

On July 30, 1997, Plaintiff participated in a scoliosis study, the results of which revealed "a thorcolumbar scoliosis directed to the left" with a "very minor compensatory lumbar curve." (Tr. 228).

On May 11, 1998, Plaintiff dislocated her left shoulder. (Tr. 235, 237). Plaintiff's arm was placed in a sling and she was instructed to discontinue participating in cheerleading activities. (Tr. 237-38). Plaintiff began participating in physical therapy in June 1998. (Tr. 238). When examined on July 13, 1998, Plaintiff exhibited "minimal pain" and "good range of motion of her shoulder." (Tr. 239). Plaintiff reported experiencing "occasional pain with overhead lifting." (Tr. 239). Plaintiff was cleared to participate in cheerleading activities, so long as she not lift people "with her hand over her head" or participate "in the base of the pyramid." (Tr. 239).

On August 19, 1998, Plaintiff reported experiencing "some soreness" in her left shoulder, but exhibited "full active range of motion." (Tr. 241). Plaintiff was instructed to "work on strengthening" her shoulder by performing "exercises with weights." (Tr. 241). A November 6, 1998 examination of Plaintiff's injured shoulder revealed "good range of motion" with "no evidence of any weakness." (Tr. 242). Plaintiff was instructed to perform activities as tolerated. (Tr. 242).

      B.      Mental Impairments

In 1994, Plaintiff was diagnosed with attention deficit-hyperactivity disorder. (Tr. 313-16). Plaintiff was treated with medication and counseling which resulted in "significant improvements" in her condition. (Tr. 267-90, 313-59).

On May 4, 1995, Plaintiff participated in a consultive evaluation, conducted by Thomas Doubleday, the psychologist of the school which she then attended. (Tr. 291-96). Plaintiff participated in intelligence testing, the results of which revealed that she possesses a verbal IQ of 94, a performance IQ of 119, and a full-scale IQ of 106. (Tr. 293). Plaintiff's performance on additional achievement tests ranked "in the mid to upper mid-average range for a youngster of [Plaintiff's] chronological age." (Tr. 294). The psychologist concluded that Plaintiff "is not a learning disabled student." (Tr. 294).

Plaintiff treated with Dr. L. Humberto Covarrubias from November 1996 through April 2001. (Tr. 163-200). The doctor's treatment notes indicate that Plaintiff responded well to psychotropic medication, but that Plaintiff did not always take her medication as instructed. (Tr. 163-200).

On June 5, 2002, Plaintiff participated in an "initial psychiatric consultation" with Dr. Elsie Reed. (Tr. 160-61). The doctor observed that Plaintiff was pregnant, but not presently taking her psychotropic medication. (Tr. 160). Plaintiff exhibited no symptoms of mania, but the doctor observed that she was "beginning to move into depressed state." (Tr. 160). The results of a mental status examination were otherwise unremarkable. (Tr. 160-61). Dr. Reed also observed that Plaintiff possessed above average intelligence. (Tr. 161). Plaintiff was diagnosed with bipolar disorder, attention deficit-hyperactivity disorder (by history), and obsessive-compulsive disorder.

(Tr. 161). Her GAF score was rated as 70.[1] (Tr. 161). Plaintiff was prescribed psychotropic medication. (Tr. 161).

Treatment notes dated October 17, 2002, indicate that Plaintiff was "doing better." (Tr. 158). Treatment notes dated November 20, 2002, indicate that Plaintiff was "taking good care of [her] baby." (Tr. 157). Following a December 11, 2002 examination, Dr. Reed characterized Plaintiff's mood as "good," "stable," and "positive." (Tr. 156). During this time, Dr. Reed continued to modify Plaintiff's medication regimen. (Tr. 156-58).

On January 9, 2003, Deborah DiFerdinando, a licensed marital and family therapist, authored a letter regarding her treatment of Plaintiff. (Tr. 119). DiFerdinando reported that she began treating Plaintiff in May 2002, at which time Plaintiff presented with "moderate to severe" symptoms of bipolar disorder. (Tr. 119). Plaintiff subsequently exhibited "moderate to severe" symptoms of obsessive-compulsive disorder. (Tr. 119). DiFerdinando reported that Plaintiff's "low energy level and anxiety symptoms significantly impact her level of functioning and ability to consistently work outside the home at this time." (Tr. 119). DiFerdinando reported that Plaintiff "continues to work toward the reduction of these symptoms through therapy and medication management." (Tr. 119).

On February 9, 2003, Plaintiff participated in a psychiatric evaluation conducted by Dr. Sukhnandan Sidhu. (Tr. 120-26). Plaintiff reported that she continues to experience mood swings. (Tr. 121). Plaintiff also reported that she was experiencing attention deficit-hyperactivity

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A score of 70 indicates "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

disorder and obsessive-compulsive disorder. (Tr. 120-21). Plaintiff reported that her psychotropic medications "sometimes" help her. (Tr. 122). During a mental status examination, Plaintiff "display[ed] a widely variable mood varying from tearful to laughing during the interview, but appropriate to the thought content." (Tr. 125).

Dr. Sidhu diagnosed Plaintiff with (1) type I bipolar disorder, (2) obsessive-compulsive disorder, and (3) attention deficit hyperactivity disorder (by history). (Tr. 125). The doctor further concluded that Plaintiff experienced "no impairment" in her ability to (1) "understand, remember, and carry out simple one or two-step job instructions" and (2) "perform work activities without special or additional supervision." (Tr. 126). The doctor reported that Plaintiff experienced "mild impairment" with respect to her ability in the following areas: (1) maintain concentration and attention, persistence, and pace, (2) associate with day-to-day work activity, including attendance and safety, and (3) maintain regular attendance in the workplace and perform work activities on a consistent basis. (Tr. 126). Dr. Sidhu reported that Plaintiff experienced "significant impairment" with respect to her ability in the following areas: (1) follow detailed and complex instructions, and (2) adapt to the stresses common to a normal work environment. (Tr. 126). The doctor reported that Plaintiff experienced "moderate impairment" with respect to her ability to relate and interact with supervisors, co-workers, and the general public. (Tr. 126).

Treatment notes dated February 14, 2003, indicate that Plaintiff's husband recently deployed to Kuwait. (Tr. 155). Treatment notes dated February 20, 2003, indicate that Plaintiff's mood was "fragile" and that she was experiencing "ups [and] downs." (Tr. 154).

On February 28, 2003, Dr. Michael Skopec completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 129-42). Determining that Plaintiff

7

suffered from bipolar disorder and obsessive-compulsive disorder, the the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) and Section 12.06 (Anxiety-Related Disorders) of the Listing of Impairments. (Tr. 130-38). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings. (Tr. 139). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. (Tr. 139).

The same day a different examiner completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 143-45). Plaintiff's abilities were characterized as "markedly limited" in two categories and "moderately limited" in one category. (Tr. 143-44). Plaintiff's abilities were characterized as "not significantly limited" in 15 categories. (Tr. 143-44). With respect to the remaining two categories, the examiner reported that Plaintiff's abilities were "not ratable on available evidence." (Tr. 143-44). The examiner concluded that Plaintiff "is able to perform non-public simple, repetitive entry-level work on a sustained basis." (Tr. 145).

During a March 26, 2003 examination, Plaintiff reported that she spent 80 percent of her time "watching [the] war." (Tr. 153). Dr. Reed noted that Plaintiff's moods were "cycling more frequently now." (Tr. 153).

On July 26, 2003, Deborah DiFerdinando completed a questionnaire regarding Plaintiff's condition. (Tr. 147-51). She reported that Plaintiff experiences "daily mood swings," as well as paranoid beliefs that "someone will hurt her." (Tr. 149). DiFerdinando reported that

8

Plaintiff "requires assistance" from her husband to perform daily activities such as shopping, driving, and housework. (Tr. 149-50). DiFerdinando reported that Plaintiff experiences "difficulty making appointments that do not maintain a regular time/day." (Tr. 147, 150). DiFerdinando also reported that Plaintiff was not presently taking any medication. (Tr. 151).

Treatment notes authored by Dr. Reed on September 17, 2003, reveal that Plaintiff's condition was "progressing" and that she "care[s] well for [her] baby." (Tr. 152).

On May 4, 2004, Plaintiff participated in a psychiatric evaluation at Summit Pointe Behavioral Health Resources. (Tr. 389-91). Plaintiff reported that she "recently returned from California" and needed to begin treatment with a therapist and psychiatrist so that she could "get back on [her] medications and get back to living." (Tr. 389). Plaintiff reported that she "has obsessive thoughts of bad things happening" and "compulsions of rechecking and redoing behaviors that go on throughout the day." (Tr. 390). Plaintiff also reported experiencing panic attacks and depressed mood. (Tr. 390). Plaintiff did not exhibit any psychotic symptoms, psychomotor abnormalities, or cognitive deficits. (Tr. 390). Plaintiff's medications were "restart[ed]" (Tr. 391).

Treatment notes dated June 15, 2004, reveal that Plaintiff's condition was "improved" and "well controlled." (Tr. 384). On September 28, 2004, Plaintiff reported that she had been "feeling much better" and "getting out more in public by herself." (Tr. 376). Plaintiff reported that "she was feeling so well she felt she did not need the medication and took herself off it for nearly [one-half] month." (Tr. 376). Plaintiff's condition began to deteriorate, at which point she resumed taking her medications. (Tr. 376). Plaintiff did not regularly attend therapy and treatment notes dated April 22, 2005, indicate that she was discharged for treatment because she "failed to return."

(Tr. 374). Treatment notes dated September 26, 2005, reveal that Plaintiff returned to Summit Pointe for treatment, at which time she had "not been on meds for [a] long time." (Tr. 360).

Plaintiff asserts that in October 2006, she submitted an application for Supplemental Security Income (SSI) benefits, which was ultimately granted. (Dkt. #8 at 14).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

---

[2] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

**B. The ALJ's Decision**

The ALJ determined that as of the date her insured status expired, Plaintiff suffered from the following severe impairments: (1) bipolar disorder, (2) anxiety/obsessive-compulsive disorder, (3) a history of attention deficit hyperactivity disorder, and (4) obesity. (Tr. 14). The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 15). The ALJ concluded that while Plaintiff could no longer perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 15-18). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

**1. The ALJ's Decision is Supported by Substantial Evidence**

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that as of the date her insured status expired, Plaintiff retained the capacity to perform work activities subject to the following restrictions: (1) she can lift/carry 10 pounds frequently and no more than 20 pounds maximum, (2) she can stand, walk, and sit for six hours each during an 8-hour workday, (3) she can perform only simple, unskilled work involving one, two, or three step instructions, (4) she can only perform work that requires minimal contact with co-workers and brief and superficial contact with the general public, (5) she can only perform routine work that does not require frequent significant changes or adaptations, taking initiative or making independent decisions, or involve production quotas or keeping pace with co-workers. (Tr. 15). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could no longer perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly,

ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Melody Henry.

The vocational expert testified that there existed more than 6,400 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 464-66). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006) (870 jobs in region constitutes a significant number).

### a. The ALJ Properly Evaluated Plaintiff's Mental Impairments

Federal regulations articulate a "special technique" that must be employed when evaluating a claimant's mental impairments. 20 C.F.R. § 404.1520a(a). Pursuant to this regulation, the ALJ is required to make a "specific finding as to the degree of limitation" in each of the following areas: (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) episodes of decompensation. *Id.* Plaintiff asserts that the ALJ failed to assess her limitations in these four areas. In his decision, however, the ALJ examined Plaintiff's mental impairments at length and expressly found that Plaintiff experiences mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in

maintaining concentration, persistence or pace, and has never experienced episodes of decompensation. (Tr. 15).

### b. The ALJ Properly Found that Plaintiff's Impairments do not Satisfy a Listing

Plaintiff asserts that her impairments satisfy the requirements of sections 12.04 and 12.06 of the Listing of Impairments. Section 12.04 of the Listing provides as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
>
>    a. Anhedonia or pervasive loss of interest in almost all activities; or
>
>    b. Appetite disturbance with change in weight; or
>
>    c. Sleep disturbance; or
>
>    d. Psychomotor agitation or retardation; or
>
>    e. Decreased energy; or
>
>    f. Feelings of guilt or worthlessness; or
>
>    g. Difficulty concentrating or thinking; or
>
>    h. Thoughts of suicide; or

      i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

    a. Hyperactivity; or

    b. Pressure of speech; or

    c. Flight of ideas; or

    d. Inflated self-esteem; or

    e. Decreased need for sleep; or

    f. Easy distractibility; or

    g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

    h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or

    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.04 (2006).

Section 12.06 of the Listing provides as follows:

12.06 Anxiety Related Disorders: In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

    1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

  a. Motor tension; or

  b. Autonomic hyperactivity; or

  c. Apprehensive expectation; or

  d. Vigilance and scanning;

Or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

Or

        C. Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.06 (2006).

Plaintiff asserts that she is disabled because she satisfies Parts A and B of these Listings. As noted above, however, the ALJ found that Plaintiff failed to satisfy the Part B requirements of these Listings. Specifically, the ALJ concluded that Plaintiff experiences mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and has never experienced episodes of decompensation. The ALJ's conclusions in this regard are supported by substantial evidence, as the evidence detailed above makes clear.

Plaintiff also asserts that she satisfies Part C of these Listings. The Court is not persuaded. The record fails to support that Plaintiff is unable to function independently outside her home or outside a highly supportive living arrangement. The record instead reveals that when Plaintiff takes her medication and complies with her care providers' treatment instructions she is capable of functioning at the level recognized by the ALJ in his RFC determination.

        c. The ALJ Properly Found that Plaintiff can Perform the Basic Mental Demands of Unskilled Work

Plaintiff asserts that she is disabled because she is unable to perform the basic mental demands of unskilled work. While the Court does not dispute that Plaintiff has experienced significant difficulties resulting from her mental impairments, the evidence detailed above reveals that when Plaintiff takes her medication and complies with her care providers' treatment instructions

she is capable of performing work activities consistent with the limitations recognized by the ALJ in his RFC determination.

### d. The ALJ Properly Evaluated Plaintiff's Obesity

As noted above, the ALJ found that Plaintiff suffered from obesity. The ALJ further recognized that Plaintiff experiences some fairly significant exertional limitations, as evidenced by his RFC determination. Plaintiff nonetheless asserts that the ALJ erred by failing to consider the impact of her obesity on her ability to work pursuant to the procedure articulated in Social Security Ruling 02-01p. As the Sixth Circuit has observed:

> Social Security Ruling 02-01p does not mandate a particular mode of analysis. It only states that obesity, in combination with other impairments, "may" increase the severity of the other limitations. It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants.

*Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411-12 (6th Cir., Jan. 31, 2006).

The ALJ considered Plaintiff's obesity, in combination with her various other impairments, when assessing Plaintiff's residual functional capacity. None of Plaintiff's care providers expressed the opinion that Plaintiff's obesity impaired or limited Plaintiff to an extent beyond that recognized by the ALJ. As the ALJ's RFC determination is supported by substantial evidence, the Court discerns no error.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: August 7, 2008                              /s/ Ellen S. Carmody
                                                  ELLEN S. CARMODY
                                                  United States Magistrate Judge